```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
                        Greenbelt Division

UNITED STATES OF AMERICA,      :     Docket No. 13-CR-0148-CBD1

     Plaintiff,                :
                                     Greenbelt, Maryland
          v.                   :     Tuesday, April 30, 2013
                                     3:14 p.m.
RACHEL ONDRIK,                 :

     Defendant                 :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

UNITED STATES OF AMERICA,      :     Docket No. 13-CR-0149-CBD1

     Plaintiff,                :

          v.                   :

KIRK YAMATANI,                 :

     Defendant.                :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :



               TRANSCRIPT OF INITIAL APPEARANCE
                   AND ARRAIGNMENT HEARING
             BEFORE THE HONORABLE CHARLES B. DAY,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States         United States Attorney's Office
of America:                   BY:  ADAM K. AKE, AUSA
                              6500 Cherrywood Lane, Suite 400
                              Greenbelt, Maryland  20770
```

```
 1  APPEARANCES (Continued):

 2  For Defendant, Kirk            STEVEN H. LEVIN, ESQ.
    Yamatani:                      250 W. Pratt St., Suite 1300
 3                                 Baltimore, Maryland  21201

 4  For Defendant, Rachel          THOMAS ABBENANTE, ESQ.
    Ondrik:                        1919 Pennsylvania Ave., NW, #200
 5                                 Washington, D.C.  20006

 6
                                   ERIC HATHAWAY, Investigator
 7                                 Federal Bureau of Investigation

 8

 9  Audio Operator:                JESSICA IONETZ

10

11  Transcript prepared by:        JANICE RUSSELL TRANSCRIPTS
                                   1133 Tanager Trail
12                                 Virginia Beach, Virginia  23451
                                   (757) 422-9089
13                                 trussell31@cox.net

14
    Proceedings recorded by electronic sound recording; transcript
15  produced by transcription service.

16

17

18

19

20

21

22

23

24

25
```

1                              P R O C E E D I N G S

2              THE COURT:  13-149 and the second one is 13-148?

3              MR. AKE:  Correct, your Honor.

4              THE COURT:  Okay.

5              If I could have counsel identify themselves for the

6    record?

7              MR. AKE:  Thank you, your Honor.  Adam Ake for the

8    United States.  I'm joined by Special Agent Eric McAllister.

9              THE COURT:  Thank you.

10             MR. HATHAWAY:  Eric Hathaway.

11             MR. AKE:  Eric Hathaway of the FBI.  I'm sorry.

12             THE COURT:  Oh.  Thank you.

13             MR. LEVIN:  Good afternoon, your Honor.  Steven Levin

14   on behalf of Mr. Yamatani, who's standing to my left.

15             THE COURT:  Thank you.

16             Welcome, sir.

17             MR. ABBENANTE:  Good afternoon, your Honor.  Thomas

18   Abbenante on behalf of Ms. Ondrik, and she's present.

19             THE COURT:  Thank you.

20             Welcome, ma'am.

21             MR. ABBENANTE:  Thank you.

22             THE COURT:  Please be seated.  Give me a few moments.

23        (Pause)

24             THE COURT:  Okay.  I have yet to have my fingers

25   around the paperwork, which have just come into my possession,

1 | but it's my understanding that an agreement has been reached

2 | between the Government and the defendants, is that correct?

3 | MR. AKE: Yes, your Honor. So we are, we're here

4 | today for an initial arraignment and a plea entry hearing.

5 | There are plea agreements, written plea agreements that have

6 | been executed in this case and we're prepared to go forward.

7 | But first, need to have their initial hearing and then we'll go

8 | through with the -- we're prepared to go through with the

9 | rearraign, or the arraignment in this case --

10 | THE COURT: Okay.

11 | MR. AKE: -- your Honor.

12 | THE COURT: Thank you.

13 | Mr. Yamatani and counsel, I assume that you have

14 | received the copy of the charging document in this matter, is

15 | that correct?

16 | DEFENDANT YAMATANI: Yes, your Honor.

17 | MR. LEVIN: We have.

18 | THE COURT: Okay.

19 | Give me just a moment.

20 | (Pause)

21 | THE COURT: Mr. Yamatani, listen carefully to the

22 | Assistant United States Attorney who will advise you of the

23 | charges that you face by way of the Criminal Information, I

24 | believe, and he will also advise you of other, or, rather, the

25 | maximum penalty that you face. I will advise you of other

1   rights that you enjoy.

2            Feel free to be seated.

3            MR. AKE:  Thank you, your Honor.

4            Your Honor, both of the defendants have been charged

5   with a single count of making a false official writing in

6   violation of 18 United States Code § 1018.  The informations do

7   vary by the dates, but essentially, both are charged with

8   having made and delivered as true a writing containing a

9   statement that they knew to be false.  In both cases, that was

10  a voucher made and presented to the Department of Commerce's

11  National Institute of Standards and Technology, which contained

12  false information regarding a house-hunting trip for which each

13  claimed reimbursement.

14           The maximum penalty provided by statute for that

15  offense is one year of imprisonment, one year of supervised

16  release, and a fine of up to $100,000.  In addition, the

17  defendants must pay $25 as a special assessment pursuant to 18

18  U.S.C. 3013.

19           Additionally, the Court may impose a period of

20  supervised release and the defendants may be, if they violated

21  a condition of their supervised release, understand they may be

22  sentenced for a violation of, of such conditions that the Court

23  may impose.

24           This is a Class A misdemeanor, your Honor.

25           THE COURT:  Okay.  Thank you.

1        Mr. Yamatani, do you understand the nature of the

2    allegation against you?

3        DEFENDANT YAMATANI:  Yes.

4        THE COURT:  Feel free to be seated.

5        DEFENDANT:  Yes, your Honor.

6        THE COURT:  Okay.  As you heard the U. S. Attorney

7    explain, you're facing a period of incarceration of up to one

8    year, which could be followed by a year of supervised release

9    of up to one year, and if you violate the terms of supervised

10   release you could be sentenced back to jail for a one-year

11   period.

12        So it's sort of like two years of jail time with one

13   year of supervision in between.

14        As a result of these, this charge, you enjoy the right

15   to trial, judgment, and sentencing before a United States

16   District Judge.  I'm only a Magistrate Judge and a District

17   Judge has far more authority.

18        You would also be entitled to a jury trial and all 12

19   persons on the jury would have to be convinced that of your

20   guilt beyond a reasonable doubt before they could find you

21   guilty.

22        You should discuss both rights with counsel before you

23   decide whether to invoke these rights or to waive these rights.

24        You enjoy the right to testify, the right not to

25   testify, the right to confront and cross-examine witnesses, and

1 | the right to compel witnesses to appear in court on your

2 | behalf.

3 | Should you decide not to testify or should you decide

4 | that you want to testify, understand that any statements that

5 | you make could be used against you and it doesn't matter

6 | whether those statements are made here or somewhere else.  But

7 | no one can force you to say anything.

8 | Do you understand these rights?

9 | DEFENDANT YAMATANI:  Yes, your Honor.

10 | THE COURT:  You also enjoy the right to counsel and

11 | you have secured counsel, so that is a nonissue.

12 | Let me turn now to Ms. Ondrik.  Is that the proper way

13 | to say your name?

14 | DEFENDANT ONDRIK:  Yes.

15 | THE COURT:  Thank you.

16 | And, Ms. Ondrik, give me one last thing.

17 | Mr. Yamatani, any questions that you have about your

18 | rights?

19 | DEFENDANT YAMATANI:  No, your Honor.

20 | THE COURT:  Okay.  Thank you.

21 | Ms. Ondrik, in this matter you, too, have been charged

22 | with the same violation, as noted by the Assistant United

23 | States Attorney.  Do you understand the nature of the

24 | allegations against you?

25 | DEFENDANT ONDRIK:  Yes, sir.

1          THE COURT:  You also have the right to trial,

2  judgment, and sentencing before a United States District Judge.

3          You also enjoy the right to a jury trial and all 12

4  persons on the jury would have to be convinced of your guilt

5  beyond a reasonable doubt whether to find you guilty.

6          You also should discuss these rights with counsel

7  before you decide whether to use these rights or to lose these

8  rights.

9          And, of course, you enjoy the Fifth Amendment

10  protection against compelled testimony in a criminal case.

11          You enjoy the Sixth Amendment right to confront and to

12  cross-examine witnesses and you enjoy the right to compel

13  witnesses to appear in court on your behalf.

14          No one can force you to make a statement.  If you

15  decide not to make a statement, no one can use that as evidence

16  against you.  And that right protects you in this courtroom.

17  It protects you beyond the courtroom, but if you make a

18  statement anywhere anytime the Government may attempt to use

19  that statement against you.

20          Do you understand these rights?

21          DEFENDANT ONDRIK:  Yes, your Honor.

22          THE COURT:  And you also enjoy the right to counsel.

23  You have secured counsel, so that also is a nonissue.

24          Do you have any questions about anything I've said so

25  far?

1          DEFENDANT ONDRIK:  No, your Honor.

2          THE COURT:  Okay.  Thank you.

3          Let me move to the plea agreement.

4          MR. AKE:  Your Honor, I haven't had the honor of doing

5     a plea entry in front of you.  I'm not sure which, which style

6     you prefer.  Would you like me to go through and summarize the

7     essential elements of the plea agreement?

8          THE COURT:  That will be fine.  A proffer of the

9     facts, the underlying facts would be sufficient, and we'll do

10    this under the old misdemeanor rules, Rule 58, if you will.  I

11    think is correct, though it's not necessarily as scripted as it

12    would be in front of your classic District Judge --

13         MR. AKE:  Okay.  Yes, your Honor.

14         THE COURT:  -- since this is a misdemeanor.

15         MR. AKE:  Your Honor, the elements of the offense that

16    the Government would have to prove should -- would -- had the

17    defendants elected to go to trial, were, first, the defendant,

18    an officer of the United States, made and delivered as true a

19    writing and, second, the defendant knew that the writing that

20    he or she submitted contained a false statement.

21         And in the case of United States versus Rachel Ondrik,

22    the parties have agreed that had the case proceeded to trial

23    the Government would have proven the following beyond a

24    reasonable doubt and they also agree that these are not all the

25    facts that the Government would have proved had the case

1   proceeded to trial:

2          The Government would have proved that the defendant,

3   Rachel Ondrik, was a special agent of the United States

4   Department of Commerce-Office of Inspector General and that in

5   2007 Ms. Ondrik was transferred from -- she transferred from

6   the, the Washington Field Office to the Department of Commerce

7   OIG Office in Atlanta, Georgia.  In 2009, she returned to the

8   Washington, D.C. office where she continued to work for the

9   DOC-OIG.

10          Now as part of this change of station from Georgia to

11   Washington, D.C. Ms. Ondrik defrauded and attempted to defraud

12   the United States and the Department of Commerce by submitting

13   false writings and making material misrepresentations to the

14   Department of Commerce while seeking reimbursement for

15   relocation expenses.  She submitted these false writings to the

16   National Institute of Standards and Technology-Office of

17   Finance, Financial Resource Management, which is located in

18   Gaithersburg, Maryland, and that agency processed the DOC-OIG's

19   travel claims.

20          Now specifically, on or after July 7, 2009 Ms. Ondrik

21   applied for and was granted relocation benefits from the

22   Commerce Department because her transfer from Atlanta to

23   Washington, D.C. was determined to be in the Government's

24   interest.  Her authorized relocation benefits included

25   reimbursement for a house-hunting trip, en route travel, and

1    temporary quarters subsistence expenses and approval of these

2    reimbursements was contingent on Ms. Ondrik's adherence to the

3    federal travel regulation.

4           And during this time Ms. Ondrik and Mr. Yamatani, a

5    fellow DOC-OIG agent who was also in the process of relocating

6    from Atlanta to Washington, showed that both agents were aware

7    of rules and regulations governing their relocations and the

8    reimbursements to which they were entitled, yet both Ms. Ondrik

9    and Mr. Yamatani attempted to secure payment from the Commerce

10   Department in amounts that exceeded those authorized by the

11   governing regulations.  In one e-mail exchange on May 6, 2009,

12   Ms. Yamatani, or Mr. Yamatani and Ms. Ondrik agreed that the

13   travel regulations permitted a certain method of reimbursement

14   known as fixed rate, which dealt with temporary quarters

15   subsistence expenses, for a period limited only to 30 days with

16   no extensions permitted and although they both agreed that

17   their supervisors were unaware of the, the time limitation on

18   this entitlement, they agreed to conceal these limitations from

19   their supervisors and to seek reimbursements in excess of what

20   those regulations authorized.

21          Later, Ms. Ondrik knowingly submitted a false travel

22   voucher on or about August 20, 2009 which sought reimbursement

23   for a ten-day house-hunting trip that she claimed she and her

24   husband took to D.C. between July 22 and July 31, 2009.  She

25   claimed a number of specifics on that voucher but, in fact,

1   Ms. Ondrik did not make a house-hunting trip during that

2   period, nor did the actual house-hunting trip she had taken

3   earlier in July last a full ten days, nor had she incurred the

4   claimed expenses.  She nonetheless knowingly submitted that

5   voucher containing the false statement and sought reimbursement

6   of $4,000, $4,058.75.

7          Later -- actually, earlier, on August 10, 2009,

8   Ms. Ondrik had submitted false travel vouchers seeking

9   reimbursement of $1,531 for her en route travel to Washington,

10  D.C.

11         And on September 26, 2009, she submitted a false TQSE

12  voucher that claimed $33,973 in expenses, which was more than

13  $20,000 over what the travel regulation allowed.

14         THE COURT:  What was that last figure, 33,000 how

15  much?

16         MR. AKE:  $33,973.50.  That was -- that -- that

17  voucher was not, ultimately not authorized, your Honor.  Let me

18  go a little further.

19         On the en route voucher, the, there were inaccuracies

20  in that she claimed she and her family departed their Georgia

21  home on August 5, 2009 and had driven their personal vehicle to

22  Roanoke, Virginia where they spent the night.  On the voucher,

23  it then claimed that they had driven the rest of the trip to

24  Clarksburg, Maryland the following day and on the voucher she

25  claimed reimbursement for meals, hotel, mileage, and

1   miscellaneous expenses.  In truth and in fact, Ms. Ondrik and

2   her family had traveled to Maryland back in July 2008 during

3   the period that she claimed that they were house hunting and

4   did not return to Georgia, as her vouchers falsely claimed.

5          Ms. Ondrik was aware that both vouchers contained

6   false information when she completed them and submitted them to

7   the DOC-OIG and the National Institute of Standards and

8   Technology.  Altogether, she submitted at least three false

9   vouchers that sought reimbursement from the United States in an

10  amount totaling $39,563.25.  NIST ultimately denied the claim

11  for the TQSE; instead, only paid $10,800.15 to which Ms. Ondrik

12  was entitled.  Ms. Ondrik, however, then persisted in her claim

13  for reimbursement for the higher amount despite the fact that

14  those earlier e-mail exchanges showed that she knew that her

15  claim had exceeded the 30-day maximum period authorized by

16  regulations.

17         Subsequently, on several occasions between 2009 and

18  2011 Ms. Ondrik reaffirmed the earlier false statements

19  contained in her vouchers and made false statements regarding

20  the circumstances of her claims for reimbursement which

21  constituted obstructive conduct.  And that's reflected in the,

22  in the plea agreement.  The defendants have both stipulated to

23  an obstruction of justice enhancement as one of the applicable

24  sentencing guidelines, your Honor.

25         Finally, between June 2009 and February 2011

1   Ms. Ondrik committed several instances of time and attendance

2   fraud against her agency.  The complete loss, when taking into

3   account both the overpayments the Government made to the

4   defendants from their travel voucher claims as well as the time

5   and attendance fraud loss to the Government, in both

6   defendants' cases is approximately $14,000.  And that is

7   reflected in the restitution paragraph in the plea agreement as

8   well as serves as the basis for the agreed fine of $28,000,

9   which is a double, double amount that the parties have agreed

10  to as being an appropriate fine in this case.

11          So restitution of $14,000 as well as a fine in the

12  amount of $28,000.

13          THE COURT:  Now that -- most of that went to

14  Ms. Ondrik.

15          MR. AKE:  Yes, your Honor.

16          So the -- with regards to, to Mr. Yamatani, the facts

17  are, are very similar.  The specifics of his -- I'll go ahead

18  and proceed to that.

19          Mr. Yamatani was also a special agent in the same

20  Department of Commerce-Office of Inspector General office in

21  Atlanta, Georgia.  In 2009, he also elected to move to

22  Washington, D.C., the Washington, D.C. office.  That move was

23  also found to be in the interest of the Government.  His move

24  dates were at a different time.  He first applied for

25  relocation benefits on or about May 1, 2009.  I'd already

1  spoken to the Court about the e-mail around that time between

2  these two agents, which showed that they knew what the, the

3  maximum temporary lodging, or temporary quarters and

4  subsistence allowance that they were authorized would be, would

5  be capped at a 30-day period.

6           On June 10, 2009, Mr. Yamatani knowingly submitted a

7  false travel voucher that sought $3,589 in reimbursement for a

8  ten-day house-hunting trip that he claimed he had taken between

9  May 28 and June 6, 2009.  He had claimed reimbursement for

10 several other expenses such as lodging, meals, mileage, and

11 parking tolls.  In fact, Mr. Yamatani did not make a house-

12 hunting trip during this period, nor did his actual house-

13 hunting trip that he did take last ten days.

14          Later, on June 10, 2000 -- actually, on or about June

15 10, 2009 as well, Mr. Yamatani submitted false travel vouchers

16 seeking $1,531 in reimbursement for his en route travel to his

17 new duty station in which he claimed had taken place on June 7,

18 2009.  He also submitted a false TQSE voucher on July 27, 2009.

19 He was aware that both vouchers contained false information

20 when he completed them and submitted them to the DOC-OIG and

21 NIST and altogether, he submitted at least three false vouchers

22 that sought reimbursement from the United States in the total

23 amount of $36,305.57.

24          NIST personnel discovered they had actually paid out

25 most of the claimed expenses, but they determined later that

1    his payments were in excess of the entitlements that the

2    federal travel regulation authorized and so began recouping

3    payments.   Mr. Yamatani resisted the recoupment.   He persisted

4    in his claims for reimbursement despite the fact that, as

5    evidenced by those e-mail exchanges, he knew that, that,

6    particularly, the TQSE voucher was submitted for an amount, or

7    an amount of time in excess of what was authorized and he knew

8    that the other two vouchers for en route travel and the house-

9    hunting trip contained false information.

10           And so between 2009 and 2011 Mr. Yamatani continued to

11   reaffirm his earlier false statements that were made in those

12   vouchers and made false statements regarding the circumstances

13   of his claims for reimbursement, which also constituted

14   obstructive conduct.

15           And similarly, between June 2009 and February 2010

16   Mr. Yamatani committed several instances of time and attendance

17   fraud and the total loss to the Government as a result of both

18   the overpayments on the travel vouchers, to which he was not

19   entitled, as well as the time and attendance fraud is

20   approximately $14,000.

21           THE COURT:   Okay.   Thank you.

22           We need to reload and start in a different direction

23   because we've gotten a little bit ahead of ourselves.

24           Obviously, there's a plea agreement that's been struck

25   between the Government and the two defendants and I've got to

1    engage in a voir dire, if you will, of the individual

2    defendants.

3            Speaking first with Mr. Yamatani, you've heard me

4    earlier indicate many of the rights, but I have to go through

5    that a little bit now.

6            It's my understanding you're pleading guilty to the

7    charge of submission of a false official writing under 18

8    U.S.C. 1018.  Obviously, you know the maximum penalties 'cause

9    we just discussed that.

10           Has anyone made any promises, threats, or inducements

11   to get you to plead guilty?

12           DEFENDANT YAMATANI:  No, your Honor.

13           THE COURT:  Do you understand that if I accept your

14   guilty plea you could be sent to jail and you could be sent to

15   jail today?

16           DEFENDANT YAMATANI:  Yes, your Honor.

17           THE COURT:  Do you still wish to plead guilty?

18           DEFENDANT YAMATANI:  Yes, your Honor.

19           THE COURT:  You'll be given up valuable rights by

20   pleading guilty, including the right to a trial.  And at the

21   trial the Government must prove these allegations against you

22   beyond a reasonable doubt   You don't have to prove that you

23   are innocent, but by pleading guilty you're giving up your

24   right to a trial.  Is that something you wish to do?

25           DEFENDANT YAMATANI:  Yes, your Honor.

1      THE COURT:  You also enjoy certain trial rights and

2  I've spoken to those a little bit earlier today, but those

3  rights are, include the right to testify or not testify, the

4  right to confront and to cross-examine witnesses, and the right

5  to compel witnesses to appear in court on your behalf.

6      Do you understand these rights?

7      DEFENDANT YAMATANI:  Yes, your Honor.

8      THE COURT:  Do you wish to give these rights up by

9  pleading guilty?

10     DEFENDANT YAMATANI:  Yes, your Honor.

11     THE COURT:  In this matter, you've been represented by

12 Mr. Steven Levin.  Are you satisfied with his services?

13     DEFENDANT YAMATANI:  Yes, your Honor.

14     THE COURT:  Are you currently under the influence of

15 any substance that may affect your judgment?

16     DEFENDANT YAMATANI:  No, your Honor.

17     THE COURT:  Are you suffering from any mental

18 condition, illness, or defect that may affect your judgment?

19     DEFENDANT YAMATANI:  No, your Honor.

20     THE COURT:  Are you pleading guilty because you are

21 guilty?

22     DEFENDANT YAMATANI:  Yes, your Honor.

23     THE COURT:  Are you saying that you're guilty for any

24 other reason?

25     DEFENDANT YAMATANI:  No, your Honor.

1    THE COURT:  Do you understand you'll be facing other

2 potential collateral effects of a criminal conviction?  It very

3 well could result in your being disqualified for certain

4 government programs or you may be disqualified from certain

5 educational loans or certain professions, certain fields of

6 study.  It may deny you access to various permits.  It could

7 result in your loss of the right to vote, other citizenship

8 entitlements, and if you are not a U. S. citizen it could

9 result in your being deported.  It could result in your being

10 denied admission for citizenship or nationalization or anything

11 along those lines.  All of these things may come into play.

12    Hearing all of this, do you still wish to plead

13 guilty?

14    DEFENDANT YAMATANI:  Yes, your Honor.

15    THE COURT:  I find that your decision to plead guilty

16 is being made freely and voluntarily.

17    Turning now to Ms. Ondrik, you also have, apparently,

18 agreed to plead guilty to the charge of submission of a false

19 official writing under 18 U.S.C. 1018, is that your

20 understanding?

21    DEFENDANT ONDRIK:  Yes, sir.

22    THE COURT:  Has anyone made any promises, threats, or

23 inducements to get you to plead guilty?

24    DEFENDANT ONDRIK:  No, your Honor.

25    THE COURT:  Do you understand that if I accept your

1   guilty plea you could be sent to jail and you could be sent to

2   jail today?

3            DEFENDANT ONDRIK:  Yes, your Honor.

4            THE COURT:  Do you still wish to plead guilty?

5            DEFENDANT ONDRIK:  Yes, sir.

6            THE COURT:  You also have certain rights you'll be

7   giving up, including the right to a trial.  And at the trial

8   the Government must prove that you are guilty beyond a

9   reasonable doubt   You do not have to prove anything, but by

10  pleading guilty you're giving up that right to a trial.  Is

11  that something you wish to do?

12           DEFENDANT ONDRIK:  Yes, your Honor.

13           THE COURT:  You also enjoy the right to testify and

14  the right not to testify, as I explained to you a bit earlier.

15  You also have the right to be present when anyone else

16  testifies.  You have the right to make sure your witnesses

17  appear and testify.  You have the right to ask questions of

18  everyone who testifies, but you're giving all of those rights

19  up by pleading guilty.  Is that something you wish to do?

20           DEFENDANT ONDRIK:  Yes, your Honor.

21           THE COURT:  Are you currently under the influence of

22  any substance that may affect your judgment?

23           DEFENDANT ONDRIK  No, sir.

24           THE COURT:  Are you suffering from any mental

25  condition, illness, or defect that may affect your judgment?

1          DEFENDANT ONDRIK:  No, your Honor.

2          THE COURT:  You've been represented in this matter by

3    Mr. Thomas Abbenante.  Are you satisfied with his services?

4          DEFENDANT ONDRIK:  Yes, your Honor.

5          THE COURT:  Are you aware that if you plead guilty, if

6    I accept your guilty plea, you may suffer additional legal

7    consequences, including being unable to keep certain licenses,

8    permits, or jobs, being unable to keep public benefits such as

9    housing or education loans or assistance loans?  You may even

10   receive a harsher sentence in the future if you get convicted

11   of anything else and you could have forfeiture of certain

12   property.  You may be unable to vote or possess a firearm and

13   if you're not a U. S. citizen you could be subject to

14   departure, removal, exclusion from admission in the United

15   States, or denial of citizenship.

16         Hearing all of those things, do you still wish to

17   plead guilty?

18         DEFENDANT ONDRIK:  Yes, your Honor.

19         THE COURT:  I find that your decision to plead guilty

20   is being made freely and voluntarily.

21         I believe I've already heard a proffer of facts from

22   the Government, is that correct?

23         MR. AKE:  Yes, your Honor.  It's just -- I, I'd like

24   to just make sure we get on the record there is a waiver of

25   appeal in the plea agreement for both defendants.  Both

1  defendants have knowingly waived the right to appeal the fact

2  of their conviction.  They've also given up the right to appeal

3  their sentence so long as the sentence that the Court imposes

4  is at or below the range provided for by Offense Level 10 and

5  the United States Attorney's Office has concurrently given up

6  its right to appeal any sentence that the Court imposes so long

7  as it is at or above the range provided for by Offense Level

8  10.  Neither defendant gives up their right to appeal an

9  unlawful sentence such as one that exceeds one year in prison

10  or one that is a result of any kind of arithmetical technical,

11  arithmetic or technical error.

12          I'm not sure the -- there have been guideline

13  stipulations as well as there are agreements that the

14  Government has undertaken relative to the, the penalty that the

15  Government agreed to.  I recommend to the Court the Government

16  is representing that it will request a sentence of probation as

17  part of the plea agreement when it does come time for

18  sentencing.

19          And both parties agree to jointly recommend that a

20  fine of $28,000 in addition to the $14,000 agreed restitution

21  is the appropriate penalty in this case as a, as the financial

22  element of the, the judgment that the Court will impose.

23          Both parties contemplate that the, the Court will

24  order the preparation of a pre-sentence report and they have

25  already spoken with the Probation Office.  They are prepared to

 1   submit to interview following today's session at a mutually

 2   agreeable time with a probation officer.

 3          So I think that's all the essential elements I wanted

 4   to make sure were out on the record, your Honor.  I believe you

 5   covered everything else.

 6          THE COURT:  Fair enough.  Thank you.

 7          MR. AKE:  Thank you.

 8          THE COURT:  Let me go first with Mr. Levin.

 9          Is the agreement that I've heard essentially the

10   agreement reached?

11          MR. LEVIN:  Yes, your Honor.

12          THE COURT:  And in terms of the proffer that has been

13   provided, is, are there any modifications or corrections by

14   counsel?

15          MR. LEVIN:  No, your Honor.

16          THE COURT:  Okay.  Thank you.

17          Mr. Yamatani, is what has been told to me factually

18   correct with respect to the Government's allegations of the

19   underlying activity?

20          DEFENDANT YAMATANI:  Yes, your Honor.

21          THE COURT:  Thank you.

22          Then I find there's an adequate basis for your plea of

23   guilty and I find you guilty of the charge of submitting a

24   false official writing.

25          Ms. Ondrik -- well, I guess first I should go to

1  counsel.

2          Mr. Abbenante, the agreement that has been explained

3  to me, is that the defendant's agreement as well?

4          MR. ABBENANTE:  It is, your Honor.

5          THE COURT:  Okay.  And the underlying factual

6  allegations, any modifications or corrections?

7          MR. ABBENANTE:  No, there isn't.

8          THE COURT:  Thank you.

9          Ms. Ondrik, is what has been told to me factually

10  correct with respect to the underlying factual allegations?

11          DEFENDANT ONDRIK:  Yes, your Honor.

12          THE COURT:  Then I find there's an adequate basis for

13  your plea of guilty and I find you guilty of the charge of

14  submitting a false official writing.

15          So it sounds as though what is in order is a pre-

16  sentence report and we need to set in a sentencing date.

17          Mr. Ake, you've gotten all these other things lined

18  up.  Do you have a date already?

19          MR. AKE:  No, your Honor.  We, we don't have a date.

20          THE COURT:  Okay.

21          MR. AKE:  So.

22          THE COURT:  All right.

23          MR. LEVIN:  What date does your Honor prefer?  Any --

24          THE COURT:  It's a good question.  I think we need to

25  allow time for the pre-sentence report, which I suspect could

1  be done in about 45 days.

2          Anyone have reservations about that?

3          MR. AKE:  No.  I think that, that'd be right, your

4  Honor.

5          THE COURT:  Okay.

6          THE COURTROOM DEPUTY:  They'll be appearing in June

7  for sentencing.

8          THE COURT:  Oh.  Well, then, I have to pull up my

9  calendar here.

10         Give me a moment, gentlemen.

11     (Pause)

12         MR. LEVIN:  Judge, is June 19th good for you?

13         THE COURT:  Don't know yet.  We're --

14         MR. LEVIN:  Oh, okay.

15         THE COURT:  -- reaching my Chambers here --

16         MR. LEVIN:  Oh.

17         THE COURT:  -- and we're seeing what's happening.

18         MR. LEVIN:  Okay.

19     (Pause)

20         THE COURT:  I see a June 18th, 19th, or 21.  Which did

21  you indicate?

22         MR. LEVIN:  How's the 19th?

23         THE COURT:  19th?  I can give you the afternoon.

24         MR. LEVIN:  What time, your Honor?

25         THE COURT:  Why don't we say 2:30.

1          MR. LEVIN:  That's fine.

2          THE COURT:  Okay.

3          MR. AKE:  That works for the Government, your Honor.

4          THE COURT:  Excellent.

5          MR. ABBENANTE:  Thank you.

6          THE COURT:  We'll give you something in writing

7   reflecting this.

8      (Pause)

9          MR. AKE:  And, your Honor, the, the Government has no

10  objection to the defendants remaining on, or being released on

11  personal recognizance pending sentencing in this matter.

12  Pretrial did prepare a report.  I don't know if the Court's

13  seen it.

14         THE COURT:  Yes, I have.

15         MR. AKE:  The only issue, I believe, that was

16  contentious for the defendants was the, the recommendation that

17  they both surrender their passports.  The Government does not

18  anticipate any, any flight risk, given that the Government has

19  already bound itself to recommend a sentence of probation in

20  this case and given the risk of nonappearance seems to be

21  rather minimal, the Government doesn't have any objection to

22  waiving that restriction that Pretrial recommended, if the

23  Court is willing to go along with that.

24         THE COURT:  Let me hear from the defendants why it's

25  so important that they have their passports.

1          MR. LEVIN:  Your Honor, recently Mr. Yamatani resigned

2     his position with the Department of Commerce and has been

3     trying to start a new business venture.  As a result of that

4     new business venture, just recently, as recently as last week,

5     he traveled overseas in an effort to obtain business.  It may

6     be that in the near future he'll have another opportunity to

7     travel.  We can certainly make it as part of his release that

8     he obtain permission or provide notice to Pretrial Services in

9     the event that he wishes to travel for business, but in my

10    experience it's just very time consuming to try to get a

11    passport.  If permission will be granted to travel, then he

12    would have to go to Pretrial Services or the clerk's office to

13    obtain the passport, which just takes more time.

14          And so he came back, obviously, from last week's

15    overseas travel knowing that this Criminal Information was

16    pending, that he'd be pleading guilty today.

17          So just to echo the words of the prosecutor, I think

18    the risk of nonappearance is extremely limited in this

19    particular case.

20          THE COURT:  Okay.  Thank you.

21          I'll hear from the defense.

22          MR. LEVIN:  Thank you, your Honor.

23          MR. ABBENANTE:  Well, similarly, your Honor, I mean,

24    Ms. Ondrik doesn't have any plans to leave the country and she

25    hasn't left the country.  However, it's just been my experience

1  that once a passport is turned in to Pretrial Services even

2  after the conclusion of the, of the hearing, we have to seek

3  the Court to issue an order to get it returned and I just, I

4  just thought it'd be more efficient not to have to deal with

5  that.

6          And they've been completely cooperative with the, with

7  the matters up until this point.  We've met with the

8  Government.  We negotiated this plea agreement.  They're here

9  today.  They're -- they've made plans to make a payment of

10 restitution.  And again, I don't see that there's any risk of

11 flight here.

12         THE COURT:  Thank you.

13         Based upon the recommendations of the Government, I

14 will not require the submission of the passports.  However, any

15 travel must be approved in advance by Pretrial Services, that

16 is, any travel outside of the greater Washington Metropolitan

17 area.

18         So I don't expect that they'll be heavy handed about

19 it, but I do want them to stay in the loop, that is, no one

20 should just be leaving because they can leave.  They have to

21 get permission in advance.

22         MR. ABBENANTE:  Thank you, your Honor.

23         THE COURT:  Okay.  Thank you.

24         MR. LEVIN:  Thank you, your Honor.

25         THE COURT:  Thank you.

1          Do we have any paperwork?

2          THE COURTROOM DEPUTY:  Yeah.  Curt is on --

3          THE COURT:  I think we have the paperwork coming at

4  you, so bear with us still.

5     (Pause)

6          THE COURT:  I believe we indicated that the hearing

7  was 2:30, is that correct?

8          MR. LEVIN:  Yes, your Honor.

9          MR. AKE:  Yes, sir.

10          THE COURTROOM DEPUTY:  Oh.

11          THE COURT:  Thank you.

12          Okay.

13     (Pause)

14          THE COURT:  Ms. Ondrik, you want to join your counsel,

15  come forward.

16          In fact, all four of you can come forward.  We'll give

17  you some paperwork.  I'll sign it and then you'll be free to be

18  processed by Pretrial Services.

19     (The courtroom deputy reviews paperwork with both counsel

20  and defendants)

21          THE COURT:  Thank you all.  Wish you well.

22          MR. LEVIN:  Thank you, your Honor.

23          MR. ABBENANTE:  Thank you, your Honor.

24          THE COURT:  Indeed.

25          Anything further from the Government?

1          MR. AKE:  No, your Honor.  Thank you.

2          THE COURT:  Okay.  Thank you, sir.

3      (Proceedings concluded at 3:51 p.m.)

4

5

6

7

8                          CERTIFICATE

9          I, court approved transcriber, certify that the

10  foregoing is a correct transcript from the official electronic

11  sound recording of the proceedings in the above-entitled

12  matter.

13  */s/ Janice Russell*                    June 25, 2013

14  Janice Russell, Transcriber                 Date

15

16

17

18

19

20

21

22

23

24

25